[Civ. No. 17808. First Dist., Div. One. Nov. 14, 1958.]

LOUIS C. ROBERTS, Appellant, v. HAROLD E. PARKER et al., Respondents.

*Assigned by Chairman of Judicial Council.

C. Jay Hollander for Appellant.

Robert J. Foley and Burt S. Hofmann for Respondents.

BRAY, J.—Plaintiff appeals from that portion of a judgment adjudging proper a certain deduction by defendants in the purchase price of real property and fixing a certain date as proper for the proration of taxes and interest.

### QUESTIONS PRESENTED

1. Under the agreement of sale did seller agree to pay sewer bonds assessment?

2. What was the proper date for closure of escrow to fix date for proration of interest and taxes?

March 3, 1956, the parties entered into a written agreement in which plaintiff agreed to sell and defendants to buy plaintiff's interest in approximately 83½ acres of land in Sacramento County. As plaintiff merely had options to purchase the property requiring the consents of the optioners to any sale by plaintiff, the agreement required these consents to be obtained. It also required the approval of the Public Utilities Commission for the use of Mills Park Road or Drive as a public crossing. All necessary documents and purchase price were to be placed in escrow with a certain title company. Escrow was to close within 45 days after receipt of Public Utilities Commission approval of the grade crossing, but in no event later than six months from date of agreement. A certain order of the Public Utilities Commission was issued March 13. Plaintiff contends that this order started running the 45-day period in which the escrow was to be closed, and within that period placed in escrow all documents required of him. May 22, a second order of the Public Utilities Commission was issued. Defendants contend that the 45-day period did not commence to run until this date. May 16, assessment for the construction of the Rancho Cordova sewer plant became a lien on the property. July 6, defendants placed in escrow the purchase price, less, however, the sum of $16,059.91, the amount of said lien, and instructed the title company to prorate taxes and interest as of July 6, 45 days after the second Public Utilities Commission order. Plaintiffs refused to allow the escrow to close, claiming that defendants were liable under the agreement for the sewer assessment, and that the proper proration date was April 27, 45 days after the first Public Utilities Commission order. The parties then entered into an agreement permitting the sale to be completed, but reserving for court determination the propriety of the deduction for sewer liens and the question of the proper proration date.

### 1. LIABILITY FOR SEWER ASSESSMENT.

*Terms of Agreement*

 Paragraph fifth of the sale agreement (the agreement was the typical title company printed deposit receipt form) provided: "Any assessment for improvements now in construction or recently completed or now a lien is to be . . . (paid by the seller)." The printed form contains after the above mentioned words "is to be" the words "assumed by

the buyer" and the words "paid by the seller." "[A]ssumed by the buyer" was stricken out. The agreement further stated that the property was "to be free from encumberance [sic], unless otherwise noted. . . ." Under the agreement as signed it is clear that the seller obligated himself to pay the assessment for the construction of the Rancho Cordova sewer plant, as it was constructed prior to November 3, 1955, and notice of completion was recorded on that day. So the assessment which came after the signing of the contract was for an improvement "recently completed." Thus, regardless of the closing date of the escrow plaintiff had bound himself to pay any assessment whenever levied for an improvement already constructed.

Plaintiff contends, however, that this clause is ambiguous and therefore subject to parol evidence to properly interpret it. He then contends that the parol evidence would support his contention that any assessment for sewer plant bonds was not included in the clause above mentioned. We do not find the clause to be ambiguous and hence it does not need parol evidence to interpret it. Moreover, we find no parol evidence in the record to vary the plain terms of the contract. There was very little testimony at the trial. The bulk of the trial consisted of discussion between court and counsel together with stipulations and documentary evidence. Plaintiff testified without objection that prior to entering into the agreement he and defendant Parker had talked about "sewer costs as so much per lot." He told Parker the latter could consult with certain persons for "a decisive figure." When directly asked if defendants stated they would assume the costs of the sewer bonds on the property, he answered "No." He also testified that defendants had not told him they wanted him to assume these costs.

Defendant Parker testified that plaintiff had given him an estimate of the sewer costs per lot. Apparently this was prior to the signing of the agreement. He testified that plaintiff did not give him the name of any person to consult with concerning the amount of the sewer bonds. Other than the clause in the contract, this was the only evidence on the subject. Obviously this testimony in nowise contradicted the finding of the court that under the contract plaintiff was obligated to pay the sewer bond assessment.

The agreement made the options held by plaintiff a part for all purposes. One of the options provided that if

exercised the buyer would pay this particular assessment. Plaintiff contends that that clause in the option conflicts with the clause in the agreement to the effect that the seller will pay the assessment and hence there is an ambiguity. We see no conflict or ambiguity. There are two different sellers, the one mentioned in the option, and plaintiff. Plaintiff assigned his option to defendants and as between defendants and the original seller defendants would have to assume payment of the assessment. However, as between plaintiff and defendants plaintiff agreed that he would pay the assessment.

Attached to the deposit receipt is an ''Exhibit A'' which provides the method of payment of the purchase price and certain credits to be allowed defendants on the purchase price. Plaintiff contends that the enumeration of those credits conflicts with the requirement that the seller pay the assessment. We fail to understand the logic of this contention. A mere reading of ''Exhibit A'' shows that the contention is unfounded.

While plaintiff contends that the agreement was hastily and imperfectly drawn, it should be noted that at its drawing and execution both parties were represented by their attorneys.

2. CLOSING OF ESCROW.

For closing, the agreement gave defendants until 45 days from approval of Mills Park Drive as a grade crossing. In 1955 plaintiff had applied to the Public Utilities Commission for approval of the subject grade crossing. As defendants were purchasing the property for subdivision, it was imperative that there be a grade crossing for easy entrance to the property. Hence the condition in the agreement that the escrow did not begin to run until the Public Utilities Commission approval could be obtained. The March 13 order found ''that public convenience and necessity require the construction of a grade crossing as proposed in the application.'' It then stated: ''That upon the filing by the owner or owners of Mills Park Estates of a final subdivision map of said subdivision as indicated in the foregoing opinion and the acceptance thereof by the appropriate authority of Sacramento County, the Commission will issue a supplemental order herein authorizing the construction of a crossing at grade connecting said Mills Park Estates with U. S. Highway 50 across the Southern Pacific Company's Placerville Branch.'' Although the recital portion of the order found that public

necessity required a grade crossing "as proposed in the application" and the application asked for a crossing at Mills Park Drive, the order stated: "Until the map is filed the crossing authority may not be granted for a specific location. The Commission's staff sees the need for some definite plan of crossings along the stretch of parallel highway and track."

It is obvious that this order merely recognizes the need for a grade crossing into the property. It does not approve the use of Mills Park Drive as such crossing. Such approval awaits the filing of a final subdivision map and its acceptance by the county and the further determination that the grade crossing shall be at Mills Park Drive. The county of Sacramento might not have approved the map or the commission might have required a crossing at another location. At least it reserved that right.

The fact that at the hearing before the Public Utilities Commission the Sacramento County engineer stated that the map was approved by him did not make the order effective, nor in any way mitigate the order's requirement that the map must be filed and accepted by the "appropriate authority of Sacramento County" (the board of supervisors) and the provision "Until the map is filed the crossing authority may not be granted for a specific location." Nor did the fact that defendants started grading on the land prior to the final order of the commission change the effective date of the escrow. The agreement provided that possession might be delivered to the buyer "on or before closure of escrow." So it was not until the supplemental order of May 22 that the approval of Mills Park Drive as a grade crossing was obtained. The court properly found the date of approval to be May 22, and that 45 days after receipt of such approval was July 6, the date upon which defendants deposited the purchase price in escrow. Thus, July 6 is the proper date for the proration of taxes and interest and the judgment so finding is correct.

The judgment is affirmed.

Peters, P. J., and St. Clair, J. pro tem.,* concurred.

---

*Assigned by Chairman of Judicial Council.